Now, McCray has argued that the district court failed to afford him a timely Monsanto hearing, thereby violated his Fifth and Sixth Amendment rights, and the government has contended, in response, that McCray didn't go into the right court and McCray didn't make the right showing that would have entitled him to that hearing. Neither of these reasons have merit. The district court, of course, could have assumed jurisdiction over the property in this case under Federal Rules of Criminal Procedure 41G. I think it's – Should we make a distinction between the $100,000 and the $450,000? Yes, I will, Your Honor. But for purposes now, that is the property that I'm talking about, at least partially.  Right. Yeah. Both of those were raised and noted in the Monsanto motion. Right. And then, of course, under 28 U.S.C. 132, the district court could have assumed jurisdiction over the property and held a timely hearing, but it didn't. Instead, he was – McCray was denied his due process right to be heard at a meaningful time. Well, what the judge told him is go see the other judge, and McCray's lawyer said, okay. It never did. Well – I mean, I think your point would have a lot more force if he went to the other judge and then had the request denied. But, you know, the judge could have – the trial judge could have – Judge Lorenz could have exercised jurisdiction over it. Didn't. Suggested an alternative. Another judge who could have exercised jurisdiction, your guy says, okay, I will, and then decides not to pursue it any further. That's correct, Your Honor. But I think that the factual scenario is really important to understand here, to understand why McCray was precluded in the end from having a timely and meaningful hearing. And what happened was, is he did go to Lorenz with retained lawyers, and they made a Monsanto motion. And Lorenz said, he's entitled to a Monsanto motion. I think he has the right to a Monsanto motion, but I'm not going to – I don't think I can assume jurisdiction over it. He was mistaken, but that's what he said. He said, then go to Judge Miller, who had jurisdiction over the $450,000, and then go to Judge Jones. That was Lorenz's comment. Judge Jones, of course, was the judge presiding over McCray 1. So what did they do? Panzer and Iredell, the retained attorneys, they marched into Jones's court with the same motion. And by the way, attached to that motion was a declaration expressing their concern that they would not be able to get paid if these funds, or some of these funds, were not released, and that they could not proceed. They did accompany their motion with that declaration. Well, what happened then was – so Jones, I guess there was a Monsanto hearing scheduled in Jones's court, but something intervened. There was something that happened in between that time, and that was the status conference hearing before Judge Burns. And this is the crux of what – why McCray was denied his due process right. Burns – there was a status conference called, and Burns, presumably for the purpose of avoiding a speedy trial problem, because McCray had no appointed counsel at that time. He had the retained counsel, which the retained counsel had expressed concern that they were not going to be able to proceed, they were not going to get paid. Actually, wasn't the concern that they expressed slightly different? In Michael Panzer's declaration, it says – it doesn't say, I'm afraid I'm not going to get paid. It says, I'm afraid they're going to – the government's going to come in and look at my ledgers, and I'd be conflicted out. Well, they were afraid that if they did receive any money from McCray, the government was going to come in and seize it. And, in fact, the government forewarned all counsel that they were prepared and willing and intended to seize not only what they had already seized, the $550,000, but they were going to seize and intended to seize all of McCray's assets that were outstanding, known or unknown. And the point is, at that point, knowing that, Judge Burns froze all of McCray's assets, essentially reducing him to indigent status. And that's the critical thing that happened in the hearing before Judge Burns. McCray had retained counsel at that hearing, Attorney Torres, Torres-Reyes. And she asked Burns to put off appointing counsel until after the Monsanto hearing. What happens if you're right on this? We reverse and then do what? I guess, at that point, there has to be a Monsanto hearing, and McCray's entitled – if he succeeds at the Monsanto hearing – to have some of his funds released, and he's entitled to retain a lawyer of his choice for his defense. You don't get a new trial. All you get is a Monsanto hearing, and if it's determined, for example, that the money was ill-gotten gain and he had no right to it to begin with, I would presume that's the end of the case. Right. But needless to say, he was entitled to a Monsanto hearing because Attorney Torres admitted that there was property – McCray had other property in addition to the $550,000 that was attached to real property, which had not yet been seized. Of course, the government said it was going to seize that, and Burns froze all those assets. What did your guy come up with to say that he didn't have enough money to hire a lawyer without the seized money? Well, his lawyers could not proceed. No, no, no. What did he come forward with to show this is all I've got? Well, our position is that after – You don't get a Monsanto hearing just because you say, I want a Monsanto hearing. You have to show that this is all the money. Everything I own is being tied up here, and I can't hire a lawyer. What did he come up with to show? Well, Burns came up with it. Burns' statement freezing all of McCray's assets, which hadn't yet been frozen, essentially froze everything he had. At that point, he was unable to hire anybody. He was indigent. Well, when was that point, though? Because the Monsanto case requires this very definite, specific, detailed showing in order to get the Monsanto hearing. And apparently you made that – or you tried to make that showing to one judge, right? Well, that showing, Your Honor, became apparent as these proceedings progressed from the hearing before Judge Lorenz in which a Monsanto hearing was made in which attorneys, his hired, retained attorneys said, look, you know, we're really afraid we're not going to get paid, and we can't proceed unless we have some security in that regard. Essentially, that's what they said in their declaration. Well, can you point me to where they said that's sufficient to become entitled to a Monsanto hearing? In any event, I think looking at Appellant's Excerpts of Records, Volume 3, page 423, both Eugene Iredale and I were contacted by Mr. McCrae for purposes of representation. We have agreed that if the funds were available, we would represent him, however, based on what happened to prior counsel for McCrae, Joseph Milton, who had $450,000 in his trust account, which was seized by the government. We are concerned that if we were to take any assets from Mr. McCrae, that the government would subpoena our ledgers, just as they subpoenaed the ledgers of Milton, the subpoena and led to the potential conflict. I don't know. And he says, Mr. Iredale and I do not want to be in the same position as we believe it counterproductive for our client. Hence, while Mr. McCrae may have some assets, although I do not believe they are sufficient to hire counsel, in effect the government has put those assets out of reach for Mr. McCrae to use in retaining counsel because of counsel's fear of the government's subpoena and our seizure of those assets. Essentially, that's in fact what happened, because the government forewarned everybody that they were going to seize everything McCrae had, not only the $550,000. And then Burns went and slammed the door shut by saying, okay, I'm freezing everything at this point. At that point, because there were assets in addition to the $550,000 and the government admitted that they might not win at a Monsanto hearing with respect to the $550,000 seizure. And that was a statement made by Judge Burns at that hearing. They admitted that. That seems to me an adequate showing, sufficient to support a Monsanto hearing. So, but when did the hearing before Judge Burns take place? The hearing before Judge Burns took place on May 2nd, 2002. Okay. And when did you make the request for the Monsanto hearing? Well, he made two requests. McCrae made a request before, let's see, they filed a notice of motion to motion on April 19th, 2002, before Judge Jones. They filed a notice of motion, a motion for a Monsanto hearing before Judge Lorenz on March 28th, 02. The government filed an opposition on April 8th. The hearing before Judge Lorenz was on April 15th. Then, based on Lorenz's recommendation that they approach Judge Jones, they filed a notice of motion, a motion for a Monsanto hearing before Jones on April 19th. Then what happened was, is I guess there was a Monsanto hearing scheduled in Jones, in Jones's court, but Judge Burns appears, has the status conference hearing, and nails the nail into the coffin with respect to McCrae's ability to proceed and retain counsel and proceed, even to retain counsel to proceed to a Monsanto hearing, to then litigate whether any funds should be released for his criminal. Well, this is all these different judges. Who was the trial court judge in this case? Lorenz. So was Burns nailing the coffin brought to Lorenz's attention in some way, in some motion? Yes. This all flowed, this all flowed together. I mean, it is confusing. It's very confusing. No, I'm just wondering, was there ever a document or an affidavit where you went back to Judge Lorenz, or the defendant went back to Judge Lorenz and said, look, now Burns frozen, all assets anywhere, we need to have a Monsanto hearing? Well, at the point that Judge Burns said that, I think the retained counsel, they withdrew. There was no Monsanto hearing here because McCrae couldn't pay anybody. And McCrae couldn't get CJA appointed counsel to go into civil court. So essentially he was stopped cold in his tracks. He could go nowhere. So the denial of the Monsanto hearing occurred when? Before Burns? Well, there was no Monsanto hearing that actually happened, and that's the Fifth Amendment violation. Denial of the request for a Monsanto hearing? Yeah. They were deferred. People kept deferring it. Judge Lorenz thought he could. You say there's never been a denial of the request for the Monsanto hearing? Well, it was deferred, Your Honor. It was, Judge Lorenz said, he believed he couldn't take jurisdiction over the property, so he deferred it. But you're appealing to Judge Jones. A refusal of the court to hold a Monsanto hearing. A title. Now you're telling me there never was a refusal to hold a hearing. Well, there was a refusal in that it just kind of went on and nobody ever held it. Nobody held it. There was not an order saying you're not entitled to it. Right. Well, Judge Lorenz admitted that he was entitled to one. Pardon me? Judge Lorenz admitted that Mr. McRae was entitled to a Monsanto hearing. He just felt he couldn't assume jurisdiction over the property. He referred him to the other judge. He deferred it to Miller, who had a civil forfeiture proceeding. And Jones. Counsel, for whatever reason, chose not to. $100,000 had been posted as partial bond in the Jones case, which was McRae won. I'm having a hard time getting my mind around that fact. That Judge Lorenz says you're entitled to a hearing. Go ask the other judge. Counsel says, okay, I will. And it never does. Well, he did. Judge Lorenz said go ask Miller or go approach Jones. Well, the attorneys approached Jones first. And then in doing that, there was a Monsanto hearing, I guess, that was supposed to be scheduled on May 9th. That didn't happen. And then what happened was the Burns hearing. Okay. Why does that leave us with the situation where your folks have just acquiesced and that's the way it is? It seems to me you folks acquiesced in that. You didn't then go back to Judge Lorenz and say I can't get my Monsanto hearing. If you said I'm entitled to it, please give me one now. And McRae had no money at that point. And no attorneys were going to represent him knowing that all his assets were frozen. That would mean they'd be working for free. No. It means they go back and have the hearing to get the money unfrozen. And then if they don't get it unfrozen, then they can go. He didn't even have the money to go get it unfrozen. He would have had to hire lawyers to litigate a Monsanto motion in the first instance to then determine whether he was entitled to any of those seized assets for his criminal defense. He didn't have the money. That doesn't make sense to me that, I mean, this is the way all these things play out. First the money is frozen and then you go and ask to have it unfrozen. Well, I mean, we can only, I think we can only address the way it played out here. That's a hypothetical. All I have is the facts in this case. And I think that by the time that Judge Burns got, you know, issued his orders, which were he appointed CJA counsel for McRae, McRae, and he ordered all his assets frozen, it was clear at that point that McRae had other assets apparently that had, that the government was aware of that they intended to seize, which Burns then froze. At that point, McRae was, could not go to civil court to litigate a Monsanto motion because under the CJA Act, he was not entitled to counsel in a civil proceeding. Did he bring that to the attention then of Lawrence to say I really need this hearing, but now I can't have it because you told me to go to these other judges, but my CJA lawyer won't? Well, his lawyers withdrew at that point. The lawyers, his retained lawyers could not proceed. But the CJA lawyers were representing him, right? Well, the CJA lawyer was appointed to handle the trial. Right, but he could go back to Lawrence and say, look, we can't get our hearing. I don't get paid for it. Judge Burns froze everything. He didn't want his counsel. He wants his own choice of retained counsel. I don't think whether his trial counsel, in fact, did that, I think it was too late for McRae. I think that the due process right is valid in terms of a timely hearing at a meaningful time. And when McRae needed the funds to actually either retain a lawyer just to litigate the Monsanto hearing and then thereafter perhaps retain a lawyer for his criminal offense, he was frozen, basically frozen out by Judge Burns. You only have three minutes left. Did you want to talk about the other issues? Because of the number of questions the Court asked, could I have some time? No. Just go ahead, please. I think this case, I think this case is very unusual by virtue of the amount of other act evidence that was admitted, the extraordinary amount of other act evidence that was admitted, which I believe under Rule 403 completely rendered the proceeding fundamentally unfair. It was entirely prejudicial. This case was bookended by other act evidence on both sides of the spectrum. There was the McRae 1 evidence and the McRae 3 evidence. That was the Australia case. And the district court was really concerned about this evidence and gave a lot of lip service to the potential for prejudice. However, in the end, it limited very, very little of it, allowed most of it to come in. I can't understand how any jury confronted with this case and the other act evidence that was allowed to flood it could have, would not have been confused and how they could have decided the case based on the relevant admissible evidence that was directed at the FAT scheme. With respect to the evidence stemming from McRae 1, the judge in denying the defense objections said that, you know, ultimately the judge said that all this evidence was inextricably intertwined, which I don't think it is. But I think the more important question is under 403. With respect to the McRae 1 evidence, the judge failed in its own 403 analysis to even mention the fact that McRae had stipulated to being under indictment for mail and wire fraud and money laundering with respect to McRae 1. That, to me, is completely sufficient to, you know, and should have been limited at that point to the stipulation. But it wasn't. Every FAT investor was able to stand up and say, had they known about the indictment and the bankruptcy, they would have not have invested. I think it goes without saying that anybody who had known that McRae had been indicted for wire and money fraud, wire mail fraud and money laundering, of course, would not have invested with McRae. So that was sufficient to be introduced, I think, to that limit. But that's not what happened. The government inquired of every testifying investor whether they would have invested. The government also asked that question to Hiroshi Sato from Japan, which kind of dragged in McRae 3 to the trial. And that becomes more apparent with the McRae 3 evidence. But that was not all. Over defense objection, through the testimony of David Ortiz, the government trustee attorney, the bankruptcy attorney, allowed David Ortiz to testify to the IFL's involuntary bankruptcy petition, the shift from Chapter 11 to Chapter 7, McRae's signature under penalty of perjury, the introduction of IFL's total assets and liabilities, as well as liquidation of the business. Any 403 analysis would have had to include the fact of the stipulation. And in view of the stipulation, allowing all this other stuff to come in was just plain overkill. Thank you very much. We'll give you a couple minutes in rebuttal. Thank you so much. Mr. Kelly or Ms. Devine? Good morning, Your Honors. Faith Devine and Kevin Kelly appearing on behalf of the United States. I will briefly address the Monsanto issue, and then I will then turn it over to my colleague, Mr. Kelly, to address the rest of the issues raised in this appeal. So I'd like to reserve 10 minutes for Mr. Kelly. You're in charge of your own time. Go ahead. Yes. Your Honor, the issue in this case is very simple with respect to the Monsanto issue. Did Judge Lorenz err in declining to exercise jurisdiction over Mr. McRae's initial request for a Monsanto hearing? And the answer is no. And the reason why is because Judge Lorenz believed that the other district court judge that had control over these funds was the appropriate judge to hear that motion. And he told McRae's counsel that. McRae's counsel admitted on the record that they had no objection to the court declining to exercise jurisdiction, and they stated that they would then go and file their own request for a Monsanto hearing.  And the reason why is because the other district court judge that had control over the proceeds that had been seized in a civil forfeiture action. Did he just exercise discretion, or did he just or did he say I have no jurisdiction over that money? He, well, he indicated on the record that he did not have jurisdiction over the money. Right. But that's in fact an error, correct? Legally wrong. He did have jurisdiction over the money because it's the same district court where the civil forfeiture proceedings were pending. Well, it's the same district court, but it's not the same district court judge. And the reason that makes no difference under Unimex, does it? Well, I think it does make a difference because in this case, this case, the facts in this case are very different from the Unimex case, because in this case you had multiple claimants to the funds, and those claimants were not parties to the criminal action. So the only forum, appropriate forum, to really address the issue was in the civil case where all of the claimants were before the court in front of that judge, so then he could make a determination as to who had the rights to the money and whether or not Mr. McRae had the right to a release of part of those funds for his criminal defense. But the – and setting aside the fact that the lawyers failed to go to the civil forfeiture judge for a second, Judge Lorenz could have heard the question of whether those funds should have been forfeited or should be used to permit the appellant to have retained counsel in his courtroom. I don't believe he could have because there were other claimants to those funds. It's not clear on the record that Mr. McRae was the owner of those funds. Right. And that's what the hearing's about. The hearing, a Monsanto hearing, is to determine whether or not some or all of the assets that have been restrained are not traceable to the proceeds of the crime, But it's also to determine whether or not the person that's making the claim has a claim to those funds. So when you have competing interests on the property, you have to take that issue to the judge that has jurisdiction over all the claims. Why couldn't Judge Lorenz have done it? Because he wasn't the one that had control over that case. It was in front of Judge Miller. Control over the case is an administrative internal matter within the district court. Any judge can handle it. And it would be a matter of jurisdictionally. It would just be a matter of an administrative change within who, where the case was actually pending. It happens all the time within the district court. And it doesn't mean that just because this administrative procedure is in place for assignment of matters to district court judges that any particular judge would lack jurisdiction over the matter, as long as they were a district court judge of that court. I understand that, Your Honor. But in this case, there was an agreement on the record that all parties understood that the appropriate forum to file the motion was before Judge Miller, and Mr. McCrae's counsel stated on the record that they had no objection to Judge Lorenz's ruling. So it was contemplated. That's the second part. I mean, this is after we decide whether it was error to say I have no jurisdiction when he did have jurisdiction. The second part is, so he sends them, and balance counsel doesn't object and doesn't go. That's correct. Right. And that really is the key to the case, because he's complaining that he did not have a full and fair opportunity to be heard, but, in fact, he did, and he elected not to go before the court and raise the issue. And there is another issue here, is that you're not just entitled to a Monsanto hearing just because your assets have been seized. You have to show that you don't have any other source of funds to pay counsel. And the record is very clear here that Mr. McCrae did have other assets, and he admitted that he had other assets. At what time? At the time of the motion, in the initial request for a Monsanto hearing, he admitted before Judge Lorenz, he admitted he had no assets. I mean, he admitted he had assets. And the reason why he was asking for the hearing was not because he didn't have assets to pay counsel, but because his counsel was afraid that the government would seize their ledgers. That's just not a reason for a Monsanto hearing. So even if the court is inclined to rule that Judge Lorenz erred by not exercising jurisdiction, even if he had exercised jurisdiction, the request that was before the court was inadequate. So it's harmless error. It's harmless error. All right. So then Judge Burns freezes all the assets. That's correct. And now Fountain doesn't have any assets to pay counsel. Isn't he entitled to a Monsanto hearing at that time? He would be, but he never made the request. And if you look at the record, the reason why Judge Burns froze his assets is because he went to court saying, I need appointed counsel. And there's an issue out there as to whether or not the government is going to seize all of my assets, and I still have to have a Monsanto hearing to get this issue resolved. So Judge Burns, what he did is he provisionally appointed counsel under the CJA. And if you have other assets, you're not entitled to CJA-appointed counsel. So what he did is he said, okay, I'm going to freeze the assets in the interim until you get this Monsanto issue resolved. Well, what happened is, is he was happy with his appointed counsel, so he never really did get the Monsanto issue resolved. But this goes back to my earlier position, is that McCrae did have the opportunity to address the issue, and he elected not to do so. Now, Ms. Devine, it seems that both you and Mr. Brannan, is that the right name? Brannan. Brannan. Brannan. Brannan. Okay. Both lumped the $100,000 and the $450,000 together, and you're treating them exactly the same. And is that so? You take the position that we ought to just consider that one big lump of $550,000? Yes, that's correct. Because at that time, they were the $100,000 and the $450,000 were in civil forfeiture proceedings, and the $450,000 was filed on first, and then the $100,000 was filed on later. So by the time of Judge Burns's ruling, all of it was in front of the district court, and so at that time, he could have gone to court and got this issue resolved, and he didn't. And he really has no basis to complain at this point. Thank you. I'd like to now turn it over to my colleague, Kevin Kelly. Thank you. Good morning, Your Honors. Your Honors, as Mr. Brannon, excuse me, has indicated, essentially, his principal evidentiary claim boils down to what's reflected in footnote 9 of his reply brief. Specifically, it goes without saying that most people, had they known of the bankruptcy and indictment, would have decided not to invest with McRae. Having 9 or 10 witnesses repeat this fact was unnecessarily prejudicial. He also states in the reply brief on page 27 that the cumulative effect of the evidence, even assuming it had a slight intertwined connection to the charged crimes, was devastating, and the Court should have excluded it under Rule 403. My colleague, Mr. Brannon, hasn't had a full opportunity today to sort of flesh out the evolution of thought here in that initially the evidence was viewed or characterized as inadmissible 404B evidence. And now it seems to have taken on the aspect of perhaps slightly intertwined, but devastatingly or unnecessarily prejudicial evidence excludable under 403. As this Court is aware, of course, the standard is not unnecessarily or devastatingly prejudicial. It's whether it's unfairly prejudicial. In this case, Your Honors, much has been made of the fact that Mr. McRae stipulated to the fact of the indictment. And I want to make this point very clear, that Mr. McRae did stipulate to his having been indicted in McRae 1. He did not, however, stipulate to the bankruptcy. He did also stipulate to having been on pretrial release, but it was only as to the criminal indictment in McRae 1 that he stipulated. It is not, however, sufficient to say that it was unnecessarily or, according to the legal standard, unfairly prejudicial that the government had the stipulation in hand and proceeded, notwithstanding that stipulation, to ask investors if it would have been material to their decision to invest. Materiality was not stipulated to, and the government was required and certainly entitled to prove that those facts that were concealed were material. That is, they influenced investors' decision to invest, not unlike what the rival language suggests. In this case, with regard to the intertwined evidence, it was not the government that dragged McRae 1 and McRae 3 into McRae 2. It was McRae himself. The government objects to the characterization that it was a flood of evidence that came in from McRae 1 or McRae 3. In fact, it was quite limited. Principally, with respect to McRae 1, it was the fact of the indictment. Nothing more than actually that's perhaps slightly overstating it, but principally it was the fact of the indictment and the bankruptcy. With regard to the EWI, the so-called McRae 3 case, it was simply to show the nature and the source of the funds that were infused into McRae 2. McRae himself placed that. Let me back up for a second. It is clear that the district court, at least with respect to the criminal indictment, believed that it was intertwined evidence. With respect to the bankruptcy petition, the court's language was a little bit less clear, indicated that it was admissible at least under 404B and perhaps as intertwined evidence, and with regard to McRae 3, that it was intertwined. It was very limited. In fact, the district court did not permit the government with respect to McRae 3 to introduce evidence as to the number of claims that were lodged in the court of New South Wales, nor the total amount. So what the government was left with was basically the testimony of Hisashi Sato, the one Japanese investor. It was extremely limited. Now, evidence is intertwined when it constitutes part of the transaction that serves as the basis of the criminal charge or when necessary for the government to provide a coherent, comprehensible account of the criminal conduct. In this case, really there could be no clearer case of the necessity to bring very limited amount of information with regard to the IFL, IFC case and the EWI case. And really it satisfies both prongs. In addition, McRae did raise it, did introduce it in opening statements when he said that you will see that Mr. McRae put in much more money than he could have ever gotten out. In addition, with respect to his cross-examination of Brian Hannan, who was heading up Midland Euro, he suggested that it was through his own munificence that he was covering shortfalls. Furthermore, in the cross-examination he was suggesting that Midland Euro was responsible for not honoring stop-loss limits and that in fact he engaged in heated arguments with Midland Euro. Again, either through munificence or through his attempt to portray FAT as a legitimate profitable enterprise, he's suggesting that he put the money in to cover trading shortfalls or stop-loss limits that were not honored. Your Honors, in this case, I think it's also important not to lose sight of the fact that this is not simply a material concealment case. There were material misrepresentations as well. So to the extent that United States v. Wood provides support for the proposition that material concealments alone could form the basis of mail fraud or wire fraud conviction, we have much more than that in this case. The misrepresentations included past performance. It included how long FAT was in business. It included who the owner of the company was, although Mr. Owen indicated that not all investors were told the same thing. Some investors were told some things, others other things. In addition, Mr. Owen indicated that he was told to portray FAT as being run or operated by a group of investors when, in fact, Mr. McCrae was the only trader. Very, very importantly, in the government's supplemental excerpts of record from pages 322 to 347, there's promotional literature that suggests that, again, FAT was in operation in 1995, 1996, 1997, 1998, 1999, all of which was false. And furthermore, in that promotional literature, very importantly, Exhibit 194 indicates actual returns. Mr. Owen testified that each and every investor saved for the first two received this promotional literature. It shows an account A and an account B. It very significantly excludes the infusions of money that both of those accounts, both of those accounts, that McCrae directed into both of those accounts, lending the appearance, of course, that account A and account B were profitable when, in fact, they were not. Before you run out of time, I just want to ask, I think there may be three issues that are potentially affected by Blakely. Yes, ma'am. And that would be the loss calculation and the two sentencing enhancements. Do you agree? Yes, ma'am. And what should we do about that? Your Honor, I think what makes sense, especially given the timing, it's September 15th. It's the first week of October is the date on which the Supreme Court is scheduled to hear Booker and Fanfan. It would be the government's position that it would make sense for this Court to hold at least the sentencing aspect until the Supreme Court has ruled. Mr. McCrae has been detained in the other case and suffered a conviction in the other case. This is not an instance where, save for the non-Blakely-affected aspect of the sentence, he would be out. I don't know if I phrased it correctly. Yes, I understand what you're saying. So he's serving time right now on the, what, McCrae 1? He's not yet been sentenced on McCrae 1, Your Honor. My belief is that it's going to be a November sentencing. And he is serving time on the 137-month sentence that he received in McCrae 2. But if there weren't any enhancements, he would be at a base level 6, right? It would be a base defense level 6, Your Honor, plus the three enhancement for having stipulated to his being on pretrial release. So the adjusted defense level would be 9. At a criminal history category, 4, Your Honor, it places him, I believe, in a range of 12 to 18 months. Theoretically, I mean, he is close to release if he weren't detained and facing that other case. That's right, Your Honor, factually. That's kind of a novel situation, whether we can consider the other case and deciding whether Castor applies or not, because it seems to me maybe we should just be considering this case as to whether Castor applies. That's certainly up to the Court, but it would seem that this Court could take judicial notice of the fact that we would. No one has asked us to do that or given us anything to take judicial notice of. The only – my only response would be, Your Honor, that in one of the 20HA letter responses, I believe the government did indicate when Mr. McCrae was convicted in McCrae 1, and that was, I believe, November 14th of 2003. Thank you very much, Mr. Kelly. Thank you, Your Honor. Mr. Brannon, you've used up your time, but we'll give you three extra minutes if you'd like. A few points on the Monsanto issue. The 500 – of the 550,000, only a small – a small part of that was actually being requested from McCrae's defense. Yes, 100,000, I think. Well, 100,000, but if you – if you consider the fact that he needed perhaps only five or six to litigate the Monsanto motion, that would be the first step, and that would be even a lesser amount. So I really think that the district court judge could have assumed jurisdiction and, of course, could have protected the claimant's rights within the district court. Now, I would like to address a few comments to the overwhelming amount of unfairly – unfairly prejudicial – McCrae 3 evidence that came in, which I should – I think it's important to note that the government boldly stated in its sentencing papers they had proven McCrae 3 fraud beyond a reasonable doubt at the McCrae 2 trial. I think that's a pretty important statement, an admission that, in fact, they brought in so – they were able to introduce so much evidence for McCrae 3 that they proved it beyond a reasonable doubt. Judge Lorenz, on a number of occasions, said, I don't know why it's just not enough to say that the infusion money came from another investment. McCrae – the infusion money was not characterized as a result of trading profits. It was not misrepresented as anything like that. In fact, nothing was said about it, and most of the investors had no idea what – you know, where it came from or what it was. And Judge Lorenz, correctly, I think, kept saying to the government, why isn't that enough? Why do you – why do you have to bring in all this other stuff? Well, I believe that counsel might have been very – he was very good in getting Judge Lorenz to say, well, okay, it's indescribably intertwined and you can get it in. Here's what came in. Here's what came in. First of all, McCrae – I want to just note, McCrae wasn't on trial for committing a Ponzi scheme. He was on trial for charges of wire and mail fraud in conjunction with the fad investors. You know, did he lie to the fad investors? And that's what he was on trial for. Bringing this whole McCrae 3 thing in was – it just overwhelmed the trial. And I want to – I want to just note, despite the Court's reservations, the Court allowed the government to elicit from Sato testimony about his initial contacts and involvement with McCrae, the contracts he signed, the representations made by McCrae, his company's total $3.7 million investment. Was also the subject of a pending civil proceeding. And if that wasn't enough, David Stone, Mann Financial's credit compliance manager, was allowed to testify about the nature and scope of the agreement between Mann Financial and EWI, the fact that Mann Financial did not establish a separate commissions account or calculate the commissions for EWI, and even more damaging, the Court allowed the government to elicit from Stone a litany of money transfers. I mean, this just jumps right off the transcript page. Thank you very much. Not otherwise – not otherwise limited to the transfers from EWI to fad investors' account, but including all these transparently personal transfers. Thank you very much, Mr. Brannon. Mr. Kelly, Ms. Devine, thank you as well. The case to start is submitted.  All rise to report for this session and adjourn. Thank you. Thank you. Thank you.
judges: Thompson, Silverman, Wardlaw